# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA,**
   **Plaintiff,**

  v.                  Case No. 98-CR-104

**PEDRO MARTINEZ,**
   **Defendant.**

---

## MEMORANDUM

  The court of appeals ordered a limited remand of the sentence of defendant Pedro Martinez pursuant to United States v. Paladino, 401 F.3d 471 (7th Cir. 2005). United States v. Olson, 450 F.3d 655, 682-83 (7th Cir. 2006). Under Paladino, the district court's task is to decide whether, knowing that the sentencing guidelines are now advisory, it would adhere to the original sentence. In making this determination, the court must obtain the views of counsel, at least in writing, but need not require the presence of the defendant. Upon reaching its decision whether to re-sentence, the district court must either place on the record a decision not to re-sentence, with an appropriate explanation, or inform the court of appeals of its desire to re-sentence the defendant. Id. at 484.

  The parties have fully briefed the issue. I now issue the following memorandum advising the court of appeals that I would impose the same sentence in light of United States v. Booker, 543 U.S. 220 (2005).

# I. FACTS AND BACKGROUND

Defendant was indicted, along with more than thirty other members of the Latin Kings street gang, with racketeering and drug offenses. A jury convicted him of racketeering (count one), racketeering conspiracy (count two) and conspiracy to distribute marijuana and cocaine (count three) after a nine week trial. The jury specifically found defendant guilty of three predicate acts under the RICO count – conspiracy to murder and murder of Angelique Morales, and attempted murder of Jennifer Brezynski; drug conspiracy; and solicitation to murder and intimidation of Javier Salgado.

The pre-sentence report (PSR) set defendant's offense level at 52 and his criminal history category at IV under the then-mandatory sentencing guidelines, producing an imprisonment range of life. I sentenced defendant to life on counts one and two, and twenty years imprisonment on count three, with the sentences to run concurrently with each other and with an unrelated federal sentence defendant was then serving.

# II. DISCUSSION

**A.    Sentencing Factors**

Under <u>Booker</u>, the sentencing court must consider the factors set forth in 18 U.S.C. § 3553(a), which include:

(1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)   the need for the sentence imposed–

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

2

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

  (3) the kinds of sentences available;

  (4) the advisory guideline range;

  (5) any pertinent policy statements issued by the Sentencing Commission;

  (6) the need to avoid unwarranted sentence disparities; and

  (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The statute directs the court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." Id.

**B. Analysis**

  **1. Nature of Offenses**

  The crimes of which defendant stands convicted are extremely serious. The evidence showed that defendant was the leader, or "Inca," of his set of the Latin Kings from 1992 to 1994. In that position, he directed the activities of other members of the gang, including acts of violence and controlled substance offenses. Defendant was "violated" out of the gang in 1994 for allegedly cooperating with law enforcement, but later approached the national leader of the Kings while in federal prison and was "blessed" back into the gang.

  The most serious act of which defendant stands convicted is the 1994 murder Angelique Morales and attempted murder of Jennifer Brezynski. The evidence showed that the Latin Kings were angry at Morales because she had offended the gang, including encouraging a rap group to "throw down the crown" – a hand gesture considered

3

disrespectful by the Kings – during a concert. A new months after the concert, defendant was driving around with Andrew Acosta, Eric Estrada and Emiliano Vargas when he saw Morales at a gas station and pulled over. Acosta got out of the car, approached Morales and shot her repeatedly at close range, killing her and wounding her companion, Brezynski.[1] Defendant waited until Acosta completed the killing, then picked him up and drove off. Thereafter, defendant ordered another gang member to get rid of the murder weapon and hired a lawyer for Acosta with gang funds when Acosta was charged with murder in state court. Defendant later bragged, "We smoked that bitch."

In his memorandum, defendant notes certain testimony that he tried to stop the murder. Estrada testified that defendant said "leave it alone" as Acosta exited the car.[2] Based on this testimony, defendant contends that his role was mitigated.[3] I disagree. Given his actions in pulling over when he saw Morales, I find it doubtful that defendant really wanted Acosta to "leave it alone." In any event, whether or not defendant made this statement, his actions spoke louder than his words. He remained at the scene, despite Estrada's request that he drive away, because he did not want to leave "his guy." He later ordered the disposal of the murder weapon by another King, a thirteen year old boy, and

---

[1]Brezynski, who had never met Acosta, survived and identified Acosta as the shooter.

[2]However, Vargas testified that he heard no such comment.

[3]At the original sentencing, I denied defendant's motion for a downward departure based on his argument that this murder fell outside the heartland. However, under Booker, I may impose a non-guideline sentence based on factors that would not support a departure. See United States v. Cull, No. 05-CR-329, 2006 U.S. Dist. LEXIS 62012, at *13 (E.D. Wis. Aug. 30, 2006) (citing United States v. Castro-Juarez, 425 F.3d 430, 436 (7th Cir. 2005)).

4

hired a lawyer for Acosta with gang money.[4] Further, defendant's statements after the murder indicate that he supported Acosta's act. He told others that "we smoked that bitch," and that he had decided to "take advantage" of the opportunity to kill Morales because she had disrespected the gang. Another cooperating witness testified that during his time as Inca, defendant complained that Morales was publicly disrespecting the Kings, and that defendant ordered any King who saw Morales to beat her up or shoot her. Given this evidence, I see no mitigation of defendant's culpability for this murder.[5] As Morales's mother stated at the original sentencing, while defendant "wasn't the trigger man," he "was the one providing the weapons and calling the shots. I suppose this is how he became known as Pistol Pete."

Defendant also sought to have a cooperating witness, Javier Salgado, killed after the instant federal charges were filed. In 1999, defendant sent a series of letters to another member of the Latin Kings, David Lozano, who was incarcerated with Salgado, seeking to have Salgado killed. In one letter defendant stated that Salgado "needs his head spit open," and that "someone needs to deal with him." Because Lozano was also cooperating with the government, Salgado was not harmed. Nevertheless, this act further reflects defendant's violent and dangerous nature. Defendant offers no mitigation of this act in his Paladino statement.

---

[4]Acosta's state murder trial ended in an acquittal after defendant's sister provided a false alibi.

[5]Defendant notes that Acosta may have been upset after a fight with his girlfriend, which may have contributed to his actions. I recently rejected this argument and re-imposed a life sentence on Acosta. United States v. Acosta, No. 98-CR-104 (E.D. Wis. September 25, 2006) (Judgment). Acosta's sentence had been fully remanded by the Seventh Circuit because he preserved a Booker-type argument. Olson, 450 F.3d at 683.

5

Finally, defendant was involved in the distribution of large amounts of drugs, equivalent to about 30,000 kilograms of marijuana. These substances were distributed to fund the gang's activities, including acquisition of weapons used to commit acts of violence. As noted, defendant was Inca of his cell of the gang for several years. As discussed in the PSR, the gang employed violence and torture to maintain its territory, and defendant maintained an arsenal of weapons for these purposes.

In sum, the crimes defendant committed were extremely serious, and defendant has offered nothing persuasive in mitigation.

**B.    Character of Defendant**

At the time of his original sentencing in 2001, defendant was 28 years old and had already compiled a very serious record. As a juvenile he sustained adjudications for criminal damage to property, burglary and carrying a concealed weapon. In 1993, he was convicted in adult court of drug possession. In 1995, he was convicted of recklessly endangering safety arising out of an incident in which he shot at other young men, likely due to a gang-related dispute. In 1997, he was convicted in federal court in Indiana of conspiracy to distribute marijuana and possession of a firearm in relation to a drug trafficking crime and sentenced to 13 years in prison.[6] During his incarceration on the federal drug case, he compiled a record of disciplinary infractions, including fighting, insolence and possession of drugs. While housed locally for the trial in this case, he assaulted another inmate.

---

[6]Defendant also received numerous ordinance violations for disorderly conduct, loitering and resisting.

Defendant's conduct in the community prior to his incarceration was no better. He dropped out of high school, fathered two children whom he did not fully support financially, and rarely worked. He used marijuana regularly, but denied any need for treatment. He joined the Latin Kings at the age of 14, arising to the position of Inca in 1992. In 1994, he was apparently "violated" out of the gang for cooperating with police. However, he later approached the national leader of the gang while in federal prison and was "blessed" back in. Thereafter, he sought to have Salgado, an alleged cooperator against the gang, killed.

In sum, there is little positive in defendant's character and background.

In his Paladino statement, defendant notes his volatile childhood, which led him to join the Latin Kings while still a child. There is no doubt that defendant's upbringing was unstable. Like many others, he probably turned to the gang for the support he did not have at home. However, he took things much further, becoming a leader and engaging in the acts of violence of which he stands convicted. Further, his violent tendencies continued well into adulthood and cannot be blamed on being a youthful follower.

Defendant states that he has made efforts to turn his life around in prison. He obtained his HSED in 1999 while detained pre-trial in the Ozaukee County Jail, receiving good ratings. He has also completed classes within the Bureau of Prisons and expressed an interest in furthering his education. However, I must balance against these positives defendant's significant disciplinary record in prison, as well as his re-joining the Kings while in prison and attempting to have Salgado killed.

Finally, defendant notes that he maintains strong family ties, communicating with his mother and two children, now aged 17 and 16, and the children's mother, Gina Palacio, as well as other family members. Ms. Palacio states that the children want to maintain a

relationship with defendant, and defendant takes great pride in the fact that both have stayed in school and are good students. In her letter, Ms. Palacio requests that defendant receive a second chance to build a relationship with the children. These appear to be positive developments, but again they must be balanced against the significant negatives in defendant's background. I further note that at the time of original sentencing, defendant owed about $4000 in back child support.

**C.    Purposes of Sentencing**

At the time of the original sentencing, the guidelines required a sentence of life imprisonment. I must now determine whether such a sentence is necessary to satisfy the purposes of sentencing under § 3553(a)(2).[7]

The discretionary imposition of a life sentence is a most serious matter. Only if the purposes of sentencing can be satisfied with nothing less should such a sentence be pronounced. Under the facts of this case, given the nature of the offense and the history and character of the defendant, a life sentence is necessary to provide just punishment, protect the public and deter others, and I see no evidence that defendant's rehabilitative needs will be more effectively served by an alternate sentence.

A life sentence is necessary to provide just punishment. Defendant participated in a brutal, cold-blooded murder to avenge a slight to his gang. Although he did not pull the trigger, he directed the crime, drove Acosta to and from the scene, and ordered disposal

---

[7] I need not, on a Paladino remand, set forth the specific sentence I consider sufficient to satisfy the § 3553(a)(2) purposes. Instead, I indicate whether I would impose a non-guideline sentence given the discretion afforded by Booker. See United States v. Salazar-Hernandez, 431 F. Supp. 2d 931, 933 (E.D. Wis. 2006). In the present case, that requires me to compare the life sentence recommended by the guidelines with the purposes of sentencing under § 3553(a)(2).

8

of the murder weapon. In addition to the murder of Angelique Morales, he participated in the wounding of Brezynski, and sought to have Salgado killed. The most serious sentences should be reserved for the most serious crimes, and these offenses qualify. In addition, defendant engaged in drug dealing and other gang activities, which caused considerable harm to the area on the south side of Milwaukee where the Latin Kings operated. I consider the victim impact statements in the record, which further convince me that respect for the law can be satisfied with nothing less than the maximum sentence allowed by law.

A life sentence is also necessary to protect the public from further crimes of the defendant. Defendant's record displays a wanton disregard for life and a willingness to use violence when he is offended. Even within the prison system, he has sought to have others hurt or killed, and engaged in violent acts himself. There is no indication that defendant has or will leave the gang, at least voluntarily. Therefore, I must protect the public for as long as I can. Defendant notes studies showing that recidivism drops substantially with age. However, I must consider such studies with an eye on the specifics of this case, which persuade me that a life sentence is necessary.

A life sentence is also necessary to deter others. Courts must make quite clear that society will not tolerate gangs terrorizing neighborhoods, and that gang leaders will be severely punished. Further, courts must send the message that killing another over a slight will result in a most serious penalty.

Finally, I see no evidence that defendant's rehabilitative needs, whatever they may be, are better served by an alternate sentence. There is no evidence that defendant has a serious drug problem, that any condition contributed to his crimes, or that any sort of

9

treatment or therapy will decrease the danger he poses to the public. I find that his needs are being served, as best they can be, in the Bureau of Prisons. I see no treatment alternatives supporting a lesser sentence.[8]

Therefore, I conclude that a life sentence is necessary in order to satisfy the purposes of sentencing in § 3553(a).

### III. CONCLUSION

For the reasons stated, I determine that, in light of the additional discretion afforded by Booker, I would impose the same sentence. The Clerk is directed to transmit this memorandum to the court of appeals.

**SO ORDERED**.

Dated at Milwaukee, Wisconsin this 2nd day of October, 2006.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

---

[8] Defendant owed about $1500 in restitution to the crime victims compensation fund related to funeral expenses for Morales and payments to Brezynski. Given defendant's lack of employment in the community, I find it more likely that he will make payments towards this obligation in prison under the Inmate Financial Responsibility Program than under some alternate sentence. See 18 U.S.C. § 3553(a)(7). Further, given both the sentence imposed on Acosta and the guideline calculations in this case, I find that the need to avoid unwarranted disparity is best served by a life sentence. See § 3553(a)(6).